Good morning. May it please the court. Michael Caruso, Federal Public Defender's Office, on behalf of Kerri Kaley. Actions have consequences, and so do the words that lawyers use in litigation. And the consequence for lawyers is found in Federal Rule of Evidence 801D2C. And that's essentially what this case is about with regard to Ms. Kaley's trial. This case has a fractured and some would say tortured procedural history. Ms. Kaley and her husband were severed out from the first trial that only involved her co-defendant, Jenny Grunstrasse. But prior to Ms. Grunstrasse's trial, the government filed a bill of particulars where they quite clearly and directly said that the victim of the theft that was at the core of this case was the corporate employer of Ms. Grunstrasse and Ms. Kaley. Not only did the government make that statement before trial, they made similar statements at the Rule 29 stage, actually three separate statements that advanced the theory and assertions of fact that the defendants in this case stole these medical products from their corporate employer. Also, at Jennifer Grunstrasse's trial, the government, in closing arguments, I think with the clearest expression, said, well, in point of fact, in counts one through six, the superior interest that was defeated from which the defendant converted and took by fraud was from her employer. We were not saying it was the hospital. Now, this theory and these assertions of fact stand in stark contrast to the evidence and argument elicited at Ms. Kaley's trial. At Ms. Kaley's first trial, which . . . Well, I thought their argument was that, first of all, there was nothing wrong with what they did, that they could change their theory as to a defendant, but that with regard to the first defendant, that she herself, looking at what she had done, they had a certain theory. But with your client, she was dealing with a lot of folks that were doing a lot of things, and the main thing that they were doing was stealing from the shelves as opposed to having the hospital give them some things that were expired. So they're saying also different . . . They're saying they have a right to use a different theory, but they're also saying they had different facts. Is that not correct? So, yes and no. I think they had different facts in the sense, as we detail in our briefs, the government's cooperating witnesses shifted their story from Ms. Grunstrasse's trial to Ms. Kaley's trial. So in that sense, there were different facts. In the first trial, the government's cooperating witnesses testified that there was no theft from the hospital. And if you fast forward to Ms. Kaley's trials, these witnesses were now on board with the government's new theory. These were the same witnesses who changed their stories? Yes, Your Honor. And I assume they were cross-examined at great length about that change. I mean, they were cross-examined, but the prejudice that we suffered at her trial was that we didn't have the evidence of the government's prior statements about who they asserted was the government through a prosecutor may change a theory of the case. They don't have the right to hide that change in theory from the jury. And that's the main evil that happened here. So, for example... How would it be hidden from the jury if you have witness A who says in the first trial, you know, here's how I got the goods. They were expired and the hospital said, you're a nice guy. We're just going to let you have a million dollars worth of goods. Versus he comes to the second trial and the same witness says, oh, you know what? I stole them. I would think the jury's going to know because any decent defense attorney is going to cross-examine them with the inconsistent statement, correct? Right, but that's only part of it, Judge Carnes. So, there are two parts to the defense in this case, the defense that we wanted to put forward. Certainly, these witnesses were cross-examined with the exception of the issue of one of the cooperators. We weren't allowed to cross-examine him as to what his lawyer said at his sentencing, which is a standalone issue. But what we were not allowed to present to the jury was the bill of particulars that was filed in the case, excerpts of the Rule 29 argument, and excerpts of the closing argument. How does that help if you've got the testimony of the witness who you can show the side-by-side that they've changed their story? What does it help a jury to know something about bill of particulars? So, I think it goes in large part, Your Honor, to really drive home and buttress and corroborate that the shifting story not only occurred with the witnesses, but it also occurred with the prosecuting lawyers. So, if you put on one side the inconsistent statements of the cooperating witnesses, which we had in large part with that one exception, but if you add in the dogged prosecutor who, after years of investigation and his review of the evidence, came to the conclusion that the victim of the theft was the corporate employer, that gives the jury a complete picture of what happened. The investigation occurs, the indictment is brought, the prosecutor asserts on numerous occasions that the victim was the corporate employer, the cooperating witnesses testify in line with that theory, the first trial ends in a not guilty verdict. Then, for Ms. Caley's subsequent trials, the cooperating witnesses shift their stories and now say, for the first time, we stole from the hospitals, but the jury is not given the peace that the prosecutors, on three separate occasions, asserted as factual matters to a judge and to a jury that the theft was from the corporate employer. So, if you put those two pieces together, Ms. Caley is left in a much stronger position with the jury, and we know she was in a strong position to begin with because her first trial ended in a mistrial or a hung jury in large part with the exception of one count. So, we can see that it was a very, very close case from that mistrial, and I think we know if we have the evidence that came from the prosecutor's own words and his own mouth that he believed after years of investigation. We always tell the jury what the lawyers say is not evidence. We say that over and over again. We do say that, and I think everybody in this room has practiced and presided in district court, and I do believe, while true, that statement is ripped from its context. If you look at the 11th Circuit's pattern jury instruction, you can see the context of that statement is judges instruct juries. The evidence in this particular case is what comes from the witness stand. What the lawyers say essentially is to guide your view of the evidence, but that's far different than what happened here. It's apples and oranges. There's no context, or the context is not the same when we're talking about getting lawyers' words admitted into evidence, and the plain language of the federal rule of evidence permits this. I don't think there is a dispute from the other side that the government is a party opponent in a criminal case, the prosecutor is an agent for the government, and by the plain language of 801 D2C and D, these statements are statements by a party opponent, and it seems to me a stretch to argue that a very basic simple instruction to a the bill of particulars, the three statements during Rule 29, and the closing argument come in under that rule and should have been admitted at Ms. Caley's trial. I just have a record question. As I understand the record, there was no restitution to the employer. All the restitution was to the hospitals. Is that correct? That was ordered by the court. In Ms. Caley's case, there was an order of restitution. That's one of our issues in this case, and that was ordered to be paid to a hospital. Yes, Your Honor. And there was no restitution ordered in this case, in her conviction, to the employer? That's right, Your Honor. And that's because under the evidence, the evidence showed that the products were primarily taken off the hospital shelves. I'm just trying to make sure I understand what the evidence was in the case. Is that correct? That's why the employer, the employer got paid by the hospitals for everything, and then it was taken off the shelves or not delivered or however it was stolen, and that's why the hospital got the restitution. Well, I believe that the hospital got the restitution, New York Methodist. Right. Because they're the only entity that submitted a claim for restitution. Well, what was their claim for restitution about? Their claim was that they lost product. By how? I mean, that was one of the issues that they didn't really know. So the way the evidence... I know, but what was the evidence that they took it off the shelves? They replaced new products and took off the old products. That was one way. Is that correct? Right. Well, certainly the government presented evidence in the form of cooperating witnesses that they took product out of various hospitals. Yes, that was the evidence, Your Honor. Okay. But the hospitals claimed restitution in $2 million, I think that was the approximate amount, for property that was at the hospital that was taken from them in some manner. Is that correct? That was the claim, but of course there's no underlying evidence that that claim was true. What happened at trial, there was a representative from New York Methodist who testified, and this is the issue regarding the chart and it also flows into the restitution issue. He had very little knowledge of what had occurred 10 years previously. What happened is that he heard through the grapevine that another hospital had suffered a loss. So what he did is he contacted Ethicon, a Johnson & Johnson subsidiary, to get evidence of what New York Methodist spent through Ethicon for a three-year period. He got that evidence from Ethicon. He didn't do any independent research and we never were given the underlying data that he received, if he had received any at all from Ethicon. He then also talked to his distributors and he looked at all they had was sort of raw numbers of the number of surgeries performed for three years and the amount of money spent through Ethicon for those years and combined with the testimony of one of the cooperating defendants who changed his story and said that he took products from the restitution. Under the Mandatory Victims Restitution Act, the government has the burden to prove actual loss. If you look at the transcript of the restitution hearing, what essentially the judge did was what's forbidden, a sort of back-of-the-envelope guess as to how much restitution was owed. He took the numbers from those three years and then essentially subtracted the spend data from the last year from the second year and came up with this number where and he imposed restitution. But without the underlying data of those numbers, the defense was severely limited in how we could challenge or try to combat those numbers. You know, we were never given information about when the surgeries were performed, what products were ordered, when they were ordered, when they were delivered. We just didn't have that information. Like I said, we had these raw numbers that we couldn't challenge. Our right to confrontation was severely limited and under the Mandatory Victims Restitution Act, that's just not sufficient to take these raw numbers and make a judgment that because the numbers differed from years to year, there must have been theft and that that theft must be, there must be restitution for that theft. I thought the co-conspirators testified there was theft. Pardon me? I thought the co-conspirators testified there was theft. The co-conspirators testified, I mean who were who were working off plea agreements with the government did testify there was theft. And they testified, I think Dank said it was about, he got about two million dollars in product from them. So why wouldn't that be relevant? From them, but that was never tied to any hospital's actual loss. I mean under the Mandatory Victims Restitution Act. How many hospitals are we dealing with here that got restitution? In our case one, New York Methodist, just one. And we never had the underlying data from New York Methodist. And that's you know what we're here today complaining. How many hospitals, Dank had said he actually got 10 million dollars worth of product, paid two million. How many hospitals were we potentially dealing with here? Oh the government would know better than I, but a dozen. I mean there were a number of hospitals involved. But again the restitution was confined only to New York Methodist. The cooperating witness who testified that he was the representative from New York Methodist, I don't believe ever gave the jury or the judge a number of what he said he took from that hospital. So there's no evidence from Frank Tarsia. What do you say is the appropriate number? I say the appropriate number is zero, Your Honor, because they have a burden to prove actual loss and they haven't proved that loss. And we weren't given the underlying data. And I see that I'd like to reserve the balance of my time. We ask that this court vacate Kerry Kelly's convictions or in the alternative vacate her restitution award. Thank you, Mr. Caruso. You've reserved three minutes. Good morning, Your Honors. May it please the court. For the record, John Shipley for the United States of America. With me at council table is Tom Watts Fitzgerald who tried all of the Kelly cases going back the last 11 years. Let me start with the issue of the inconsistent positions and I think a couple of clarifications to the record that hopefully were evident from the brief, but let me go over those again. What happened was the government indicted this case. There was no identification of a specific victim in that. That's because the statute doesn't require it. It's a transportation of stolen property statute. The indictment did clearly allege that the defendants, including Kelly, were dealing in property to which they had no valid right, title, or interest. The government never changed from that position at any trial, in any pleading, even during Grunstrasse trial, it was on the record as saying Kerry Kelly had no right to any of these items. No matter how they were acquired by her sales representatives, there was simply no deviation in that. So when it comes to Kerry Kelly, there has never been any inconsistency. The defense in the Grunstrasse case back in 2007 asked for a bill of particulars and the court granted that and the government submitted a bill of particulars that initially identified not just the employer, but also the hospitals as victims based on the different circumstances of the case. The record isn't clear as to what the basis for the court's subsequent ruling was, but it basically came back and said, I want you to pick one victim for purposes of this case. And then the government submitted a revised bill of particulars where it said the victim for purposes of the case with respect to defendant Jennifer Grunstrasse, the victim as to each of counts two and six was Ethicon. So we're talking about Grunstrasse only. That's the exact language of what the government said in that bill of particulars, which is docket entry 159. So these claims about a global statement in the case, to use Mr. Caruso's language, as to who the victim was is not consistent with what the government represented. And the government took that as Judge Korins, you observed, in the factual circumstance of Grunstrasse as a sales rep versus the other individuals who wound up testifying for the government at Caley's trials, and that was Tarsha and Kaskinian and Schmidt. Grunstrasse dealt primarily with suture products, which are basically the kind of string you'd use to tie up wounds. And the debate- I mean, that's not really a distinguishing feature. Well, the distinction is this. It does matter in terms of what she was able to do with the hospitals. In her case, the evidence was that she was basically given this stuff back, for the most part, by the hospitals. And that's why it does matter what the type of material is. She had an obligation to her employer to return those things to Ethicon. Right. She was in a different department, so she dealt differently. And that I understand. That's the distinction. The fact that she dealt with sutures doesn't seem like a real distinction to me. I would agree with you, Judge Rosenbaum, but you clarified the point better than I did. The distinction is there are factual differences with her. And the key one, in terms of how she got the product, is she was given this stuff back, or at least that was the defense theory, and the government evidence was basically consistent with that. And then instead of returning it to her employer, to Ethicon, as she was supposed to do, she went and arranged for it to go to Cayley, so it could be resold on the black market. So the debate at that trial was about whether that was the stolen property that was being dealt with. The other sales reps, as became clear at the trials, and there was testimony to this effect at the first trial involving Grunstest, but it certainly was more clear in the first and second Cayley trials, is that they walked these items off the shelves. No claim that they were getting these things with the hospital's approval and then dealing in them, that they stole them. I mean, Tarsha testified as plain as day that he would walk in through the back door of these hospitals and take the product out. And not only that, that they would inflate the orders for the hospital, because these sales reps had the ability to essentially stock the hospitals themselves. They relied on them to do that. They would inflate the orders, come in, walk the product out, get it to Kerry Cayley, Cayley would send it down to Danx in Florida and would go on the black market sale that way. So there are fundamental differences. So both factually and in terms of what the government actually represented as its, quote unquote, inconsistent position, the, Mr. Caruso's argument. But it is represented as a single conspiracy, right? I mean, I noticed that the indictment itself charged sort of three, objects may not be the right way to describe it, but theft and then, I guess, something that in effect would go to the group in the Cayley case. But one of the other objects would have gone to the Grunstrasse case. It could have, right? I think the statute, there was an additional theory of the conspiracy that was dropped out of the Cayley trials. There was a separate object. But in terms of the statute itself, a stolen property statute. But here's the thing. I mean, Grunstrasse was, if you look at the indictment, Grunstrasse is still identified as a member of the conspiracy. And so, I mean, it seems like her role in it and the part about her alleged theft from Ethicon as opposed to the hospitals would be a relevant consideration. I think it's certainly relevant. Grunstrasse testified, though, for the defense at the Cayley trial. And so that issue, the opportunity to present her account of how she acquired this product was put before the jury. And as Judge Carnes, you also pointed out, there was extensive cross-examination of the sales reps who testified, the Tarsha, Kaskinian, and Schmidt, about supposed changes or evolutions of their testimony from what they had said initially to the grand jury. Again, I don't agree that it's as stark as Mr. Caruso characterizes it. I think you can go back to that first case. And there are clearly references by witnesses and by the government to the fact that some of this product was stolen. At the end of the day, though... That's true. But on the other hand, you know, Tarsha did in his sentencing hearing, excuse me, granted it was through Mr. Sharpstein, but he did try to get a reduced sentence by arguing, well, I didn't steal from the hospital. I mean, didn't he do that? He did make that, well, Mr. Sharpstein made that representation. But he was acting as Mr. Tarsha's agent at the time. Well, he was certainly his counsel and advocating for him at sentence. Judge Rosenwald, that's exactly right. Why shouldn't something like that be allowed to be used to impeach Mr. Tarsha if Mr. Tarsha had been asked, for example, you know, didn't you originally say that you didn't steal these things? Well, you hit the nail on the head right there because he wasn't. There was no impeachment. I know that's why I'm asking the question. But maybe there was no impeachment because there had been a ruling beforehand that there wasn't going to be able to be brought in the evidence with respect to what Mr. Sharpstein said on behalf of Mr. Tarsha at his sentencing. Well, let me try to answer this way, and hopefully this gets at your concern. To be clear, there was no testimony. He did not testify on direct examination that he stole the products. That was Mr. Sharpstein's words. So the connect isn't there. He certainly said he walked these items out of the hospital. So that word, it's not as if he testified, I stole these products. That was a label that Mr. Sharpstein was using in his advocacy back for him 10 years earlier. There was also no impeachment because before defense tried to introduce Mr. Sharpstein's statement from sentencing, the question was asked, do you remember what your counsel said at sentencing? This is now 10 years earlier, and he said he did not. So there was no impeachment to the Sharpstein statement value at all. It certainly, from a defense perspective, had relevance to try and make the point or reiterate to the jury that Mr. Tarsha's story had changed from what he had said initially. But I think we in Kendrick, I think it's about as clear as can be in saying that statements and arguments of counsel are not evidence. Not just in the jury instruction formulation that we're all familiar with from trying cases, but that from one trial to a second trial. It's true, but aren't those cases involving things like opening statements, closing arguments, which seem to me to be very and is basically the mouthpiece of the defendant there acting as his agent in that respect, don't sentence me to as high of a sentence because I didn't really steal anything. I would disagree. I think only to the extent that they are both advocacy. First of all, Kendrick doesn't have a qualification along the lines of what the court is suggesting. They are both advocacy of counsel. And I think that one is more of an argument. The other seems like more of a factual representation. I don't know. I mean, I'm asking you your thoughts. I understand. I don't see it as much of a factual distinction because whether we're talking about, again, Tarsha did not use the word steal. So we're talking about a label, at least in the context of what his testimony is. And of course, Sharpstein also said in that same oration, and this is the additional problem with all this, there was a lot of content in what that Cayley did not proffer and presumably would not have wanted in front of the court, including the statements that, look, he had no right to any of this stuff, that what he did was wrong, and also representations in the course of the argument that Cayley was the ringleader of the scheme and that she was the equivalent of a kingpin in a drug organization. But saying that he had no right to it and, I mean, we all know what he was doing. He was trying to not lose acceptance of responsibility while trying to represent the conduct in a light that is most favorable to his client. So the fact that he said he's not . . . he knows he did something wrong, I'm not sure that takes care of the problem. Well, he said . . . I understand your concerns. Can I interrupt a little? Because I'm just confused about the facts, and the facts are crucial here. So Judge Rosenbaum, I think, knows them better, so you can help me. When Tarsha pleads guilty, is there not some statement of facts that go before the judge so that . . . is there some document where he indicates what he did or something on the record where when he pleads guilty, he says what he did? Your Honor, I'm sure there would be. I don't know whether it was actually in written form. This is back in 2006. My recollection of it, and I don't have a copy of it in front of me now, is that it was not specific as to that he took these products and that he was not entitled to the products. I don't know whether it was specific, and I . . . Because I'm thinking if there was some sort of a written statement or he says orally, you know, they were expired and they gave them to me versus I walked them out, then that's something that could be impeached. You don't know the answer to that. I don't, Your Honor. And then when he's sentenced, then, is the position of his counsel essentially, it's not that big a deal, they gave it to him, he didn't steal it? Was that their position at sentencing? I don't think he put in quite those terms, so that may have been the thrust of it, this isn't as big of a deal, he wasn't entitled to have this stuff. That was the thrust of it, I think that's right. I don't think that's how the language quite came out. So then cut to how many years later after sentencing of this trial? The trial, the convictions, in 2016, so ten years later. Ten years later, his story is now not somebody gave me some expired goods because they like me, I'm a nice guy, but essentially I stole the goods. Now, I gather there was some cross-examination of him based on inconsistent statements that he had earlier given a different story? There was substantial cross-examination about precisely that issue, going back to which the court allowed full indulgence. Was that an inconsistency if it didn't deal with his plea, it dealt with what, interviews with investigators? I believe it dealt with grand jury testimony, it dealt with prior testimony in one or both of the earlier trials, the Grinstrauss trial in 2007 or the first Cayley trial in 2014. There's substantial cross-examination on that point. There's no possibility that the jury was left wondering what the defense's view of a shift in testimony from Tarsha. Was he up front with the jury that my theory, Mr. Tarsha, that my story has changed? Was that made manifest to the jury ten years ago, his story was this? Whatever form it was, now his story is a very different one. Was that made clear to the jury? I think what was clear to the jury is that he had not used, he had not used words like steal, he had not talked about stealing the property ten years earlier. In, for example, the grand jury testimony. If we decided that this was wrong, that the jury should have been alerted to this radical change of position, prosecutors should have made sure that had been done, uh, what would your argument be in defense of the verdict that we wouldn't have to reverse the whole case? Well, I think you have to, you have, as the court just observed, there was substantial, as to Tarsha himself, there was substantial cross-examination about the claim of a shift in testimony. So the jury was well aware of that. They had every opportunity to consider that. I'm asking how significant Tarsha was to the conviction. Right. I mentioned he's one. In addition, there are other witnesses, both Kes Kenyon and Schmidt, who are other two sales representatives who testified for the government, talked about walking products, same thing, walking products out of these hospitals. So he was not the only witness who said that. Beyond that, you had the evidence that was referenced earlier. But just to be clear, what he actually, what Mr. Sharfstein actually said at the sentencing hearing, which I would consider more in the lines of a proffer than an argument, which is why I think it's different than the other cases, was that Mr. Tarsha was selling medical supplies to hospitals from time to time. And hospitals would have supplies that would become obsolete. It's not necessarily due to expiration, but due to the fact that new inventions, new developments in surgery exist. So the hospitals would have an overstock lot of supplies that they didn't need anymore. And the supply representatives and the people that Tarsha dealt with at the hospitals gave them, they didn't want the supplies anymore, which is a very different story than saying, I stole them. But I think the government had its evidence at that time that these were stolen items. I don't disagree. I mean, I don't disagree that that's the case. I guess my question goes more to, why shouldn't this have come in? I mean, you know what I'm saying? In short, I do. And the summary answer on that, I see my time is over. But to answer it. Feel free to respond. First of all, we have under the law, again, these statements are not evidence. And I think Kendrick forecloses this, number one. Absent at least impeachment, which again, we don't have on this record. This is not impeaching testimony that Tarsha gave during the trial or during his direct examination. No, it's supposed to be prior inconsistent statement. OK. I thought they cross-examined him with some other. I know they didn't allow this statement by his lawyer. But I thought he was cross-examined on some other prior inconsistent statements. Exactly right, Judge Hall. Right. So this would have been cumulative, arguably. I have that he had previously testified and they cross-examined him about that he acquired these legitimately from the hospitals when they substituted newer products for older devices. OK. So he had said that before and they used that in cross-examination of Tarsha, right? That is correct. That's the grand. I believe that's the grand jury testimony referencing when in response to Judge Karn's question. OK. So that was cross-examination. That was before the jury that he had made the same type of inconsistent statement that the lawyer said before. Yes. And there may have been more than just the grand jury. OK. Then I have one other thing. It's hearsay. So it's now whether it's admissible as an admission of a party opponent. Is that what the analysis is? But he's not a party opponent. See, that's what I'm stuck on. Help me with that. Sure. Well, I think that's one piece of it. I think, and you hit on an important point, in all of this analysis about the admissibility of attorney statements, it's not simply the hearsay exception. You have to get to 401 and 403, both of which, we've argued, are independent grounds to exclude the Sharpstein oration. What that would show, to the extent it is, it would simply mean that it is not hearsay in the sense of being an admission by Tarsa. And I think the defense's logic was that this was, although it was Sharpstein saying it, and even though it wasn't adopted by Mr. Tarsa during the hearing. OK. You're over your time. Maybe I better ask Mr. Caruso what exception to hear, how we get it. OK. Thank you. He answered it. If the court has no further questions, we ask that you affirm the convictions and not speak to the restitution, but I assume the court has no further questions on that also. Thank you very much. Thank you, Mr. Shipley. Yeah, and I misspoke. It was $800,000. It wasn't $2 million. I had said earlier it was $2 million. I think it's $800,000, the restitution. I think $2 million was the total spend night. Yeah, right. That's what Your Honor was referring to. I do want to start with Frank Tarsa. He was the most important witness in the government's case, in our view, because you can't look at his testimony in isolation. He came in. He testified. He was a sales rep. He provided products to Kerry Caley to resell on the market. He also testified that he was the representative for New York Methodist Hospital. New York Methodist Hospital is the only hospital that came into the trial to testify and introduce evidence that they had products stolen from them. But didn't Mr. Schmidt also say that he represented New York Methodist at some point and that he stole from them? He did, but I don't—I believe his testimony was that he was not the sales representative at the time from 2003 to 2005. And that was the time frame where Mr. Sharp, on behalf of New York Methodist, provided the jury with the numbers about—the numbers of surgeries and the spend data. So I think in the context of the trial, Tarsa was very important in combination with the testimony from Mr. Sharp about New York Methodist. And to answer, I think, Judge Hall's question, I don't think his testimony was cumulative because it's of a differing quality. I think it's one thing to be cross-examined about prior inconsistent statements, even under oath to a grand jury or to an agent. Well, I understand what the lawyer says may perhaps have more credibility. But did they cross-examine him on prior inconsistent statements he had made before they got to this question about the lawyer's statement? They did. But they were of a different— What was his explanation on cross-examination of why at one point he had said they had given it to him and the second time he changed his mind, said, no, he stole it? What was his explanation? I'm not quite sure he gave an explanation, Your Honor. At that second trial, he came in and said there was stuff from the hospitals, which was— Did anybody from New York Methodist come in and say, you know, we never gave stuff back to people. They had to have stolen it. Was there any testimony like that from New York Methodist? I mean, I think there was testimony from Mr. Sharp, the representative from—but he had no independent knowledge of what happened during those years. You know, I think the testimony was he didn't work in the hospital. He worked at an office building a few blocks away. So he had no independent knowledge of that. But I think the cross-examination that we were not allowed to perform with regard to Mr. Sharpstein's statements is of a different quality. He's coming into court on the most important day of Mr. Charch's life, the day that the judge is deciding how long he should spend in prison. And he gives an impassioned plea. And as Judge Rosenbaum said, he essentially makes a factual proffer. These are factual assertions. This type of statement from a lawyer is different than those we see in Deloach and Kendrick. Walk me through how it gets admissible. Let's assume it's hearsay. But we know there are many exceptions. So is it because it's a statement of a party opponent? Walk me through the analysis. Right. So I think in our briefs that the admissibility was overstated. OK. I can see that. So walk me through it. So I think at trial, he's allowed to be questioned about what Mr. Sharpstein said at his sentencing hearing. But Mr. Sharpstein, his statement is hearsay. He's saying, my client told me this is what he did. But you can impeach with hearsay, Your Honor. So to impeach a witness with a prior inconsistent statement, it doesn't have to be, you know, and it doesn't have to be admissible evidence. You can say, isn't it true? Yes, if they're a party opponent. OK. No, if you're a party opponent, then it is admissible. Like we're saying Mr. Watts Fitzgerald's statements were admissible. But if you're cross-examining a witness, that statement doesn't have to be admissible to require a response from the witness. You can ask the witness on such and so day, you and Mr. Sharpstein showed up for sentencing. And Mr. Sharpstein made these statements on your behalf. And you were sitting there. And you agreed with Mr. Sharpstein. So there is essentially a prior inconsistent statement that was made by Mr. Sharpstein, but that Mr. Tarsha adopted by silence. And he fully embraced when the judge only gave him five months in prison. And of course, that was Mr. Tarsha's position that time anyway, consistently. He was consistent at that point. He had not walked stuff out, which was pointed out in cross-examination. It was, but not, we believe, with the same quality that we could have presented a statement from his own mouthpiece or advocate. I was a judge for 22 years. I don't understand why there's not something in this record at his plea, either a written statement where everybody says, here's what I did. Did you do that, Mr. Tarsha? Yeah. Or the factual basis would be, Mr. Tarsha, tell me what you did. Or the prosecutor says, here's what we could prove. Mr. Tarsha, is that accurate? I would think without having to go to the ends of the earth with hearsay and attorneys, there would have been something in that record you could have used to impeach if there wasn't. Your Honor, I don't know the answer to that. I mean, you know from being a district court judge that in every plea for it to be permissible, there has to be a factual proffer, either verbally or in writing. Usually in this district, the factual proffer, especially for cooperating witnesses, would not be very wordy. It would stick very closely to the elements. So, I don't believe that that would be a very good ground for impeachment as opposed to what . . . You all didn't request and perhaps would not have been given a copy of his pre-sentence report to see what he had said. We would absolutely not have received a copy of his pre-trial sentence report. I'll finish up . . . Since I'm not taking your time, I'm just curious because I've never had a case like this. Everything is normally . . . Neither have I. Or too much for the service they did or they never did the service. Those are all kinds of health care fraud that we've had here. I have never had a case like this. Have you ever had a case like this, this type of thing? Only this one, Your Honor. Okay. And so, where do they sell, because it's millions of dollars, to who buys, what health care person buys? This is just . . . doesn't have anything to do with your client. Who buys the product? That's been on the hospital shelves, now out of date, but yet there's a huge black market for it. Where is it going? Do we know? One, I think they call it a gray market. They don't call it a black market. Okay. But . . . Well, I thought somebody said that earlier. So, and I . . . What we're asking is we're hoping we're not going to a doctor that's using one of these products. No. By the way, these products are not out of date. These products are good products. What the testimony was is the hospitals bow to the surgeons. So, if a surgeon says, I want this suture, two weeks later they hear about a new and better suture, and the hospital buys it for them because the surgeons make the . . . Yeah, they have an oversupply. That's, you know, it's just what happens to the supply. Do you get to take it, you know, whatever. That's what Mr. Tarsha said at his sentencing. Yeah, yeah, right. And that's what the jury had to decide in this case. So, where does it go? It goes to, I mean, Mr. Dang's testimony, I don't think he was specific as to who bought the products. Okay. But not, I do not believe healthcare providers here in the United States. Okay, I see. So . . . There's some overseas market that they can sell it to. I'm speculating. I can't give you a record citation. I'm just curious, and thank you. I appreciate the panel's indulgence. I was just curious how this worked. No one put in harm through the sales on the gray market, Your Honor. Right, okay. I do want to just briefly wrap up with looking at the indictment. You know, the government made representations in their briefing here today that the trial of Ms. Grunstrauss was somehow different. If you look at the indictment, Ms. Grunstrauss, and as Judge Rosenbaum pointed out, is charged in the same conspiracy. Ms. Kaley and Ms. Grunstrauss and Ms. Kaley's husband are the only people charged in the substantive transportation of stolen goods counts. And if you look at counts two through six, you see that those counts were very specific in low amounts. So it boggles the mind to react to the government's position that the owner of the goods in counts two and six can somehow be different. I think the figures are $5,000, $8,000. There's no evidence that they were any different for counts two through six. And I would urge this court to hold that the evidence of the prosecutor's statements were admissible under the rules of evidence and not create a conflict with the Second Circuit's cases. She had a 36-month sentence. Is she in jail or is she on bond? She's just been released from the halfway house. She's still technically serving her sentence. Okay, thank you. Thank you, counsel. Thank you. Thank you.